**The People of the State of Illinois, Plaintiff-Appellee, v. William A. Wax, Defendant-Appellant.**

Gen. No. 10,730.

Fourth District.

September 26, 1966.

Rehearing denied October 24, 1966.

Charles A. Bellows, of Chicago, for appellant.

Carl A. Lund, State's Attorney, of Paris, for appellee.

TRAPP, P. J.

Defendant appeals from a conviction of a charge of murder upon the verdict of a jury with a sentence of imprisonment of not less than 20 years nor more than 35 years.

It is not denied that shortly after 7:00 a. m. on August 10, 1964, the defendant shot the deceased with a shotgun at a distance of some 20 feet as the decedent was walking away, and that as the decedent lay on the ground following such shot, the defendant approached and discharged 2 more shells into him.

It is defendant's theory that as a matter of law the State did not prove him guilty beyond a reasonable doubt in that there was failure to prove that he was sane at the time of the offense; that the trial court improperly admitted into evidence the testimony of lay witnesses to rebut the defendant's evidence of lack of criminal responsibility; that the trial court improperly limited cross-examination of lay witnesses for the prosecution upon the question of defendant's sanity at the time of the offense; that the trial court improperly admitted into evidence the testimony of Dr. Groves Smith, a psychiatrist, in that his examination of the defendant was of a nature which deprived the defendant of his right to counsel as guaranteed by the Constitution of the State of Illinois and of the United States; and finally that the trial court erred in refusing to instruct the jury as to the elements of manslaughter and in refusing to submit to the jury a manslaughter verdict.

The defendant urges that at the moment of the shooting he was suffering from a mental illness so that he lacked a substantial capacity to conform his conduct with the requirements of the law, and hence was not criminally responsible under the statute, chap 38, § 6–2(a) (Ill Rev Stats, 1965).

In behalf of the defendant, one Dr. Greenfield was requested by defendant's attorneys to examine the defendant to determine his mental condition with respect to capacity to stand trial and cooperate with counsel, his mental status as of the time of the shooting and to make such other examinations and give such treatment as was thought necessary. By reason of this arrangement, Dr. Greenfield was considered to have the status of a treating physician.

A brief chronology of the events leading to the shooting includes the following: On the evening of July 14th defendant and his wife were at a tavern in Brockton. He took his wife home at about 8:00 p. m. and went with his friend, Ashmore, to Greenup where they spent the evening at 2 taverns returning at 2:30 or 3:00 a. m. Defendant apparently received some information that decedent, Wilkey, had been to his home while he was away. There was some argument with his wife during the early morning of July 15th. Returning home from Ashmore's Tavern in Brockton on the evening of July 16th, there was some further discussion with his wife and in the early morning they went to Wilkey's home where Wax demanded an apology from Wilkey, which was made. There is evidence that on this occasion defendant threatened to shoot Wilkey in two if he came upon the place again. The evidence is that from the 18th of July through the 3rd of August, defendant and his wife had a great deal of "argument" during which she denied any intimacy with Wilkey, but she seemingly, on one or more occasions, said that she missed seeing Wilkey when they went to the tavern

167

and that she might leave the defendant. A daughter of the defendant testifying, characterized that which has been described throughout the evidence as "argument" as being mainly name-calling. On the evening of August 3rd defendant went to the tavern at Brockton at about 8:00 p. m. and following the closing at 1:30 a. m. drank a fifth of whiskey with his friend Ashmore, returning home at about 3:30 a. m. There was further "argument" with his wife about Wilkey, and there was some comment that he was ready to go if she was, upon which he fired a revolver through the window. On the evening of August 5th defendant was at a tavern in Brockton from 3:30 p. m. to 8:30 or 9:00 p. m. and was then going to Westville with a friend, but they stopped at another tavern where he became engaged in an altercation with one Charley St. Clair, who allegedly had made remarks about his wife. On the evening of August 6th, or the early morning of August 7th, defendant's wife confessed or admitted that she and Wilkey had engaged in sexual relations on the 15th of July. The testimony of the defendant is that he went downstairs and told the children of the situation and called the sheriff of Douglas County. The sheriff, being delayed in answering the call, the defendant took his shotgun and went in the truck to look for Wilkey, but not finding Wilkey at home, defendant's son persuaded him to return. En route home he threw the shotgun into a field. The sheriff of Douglas County came to defendant's home at around 5:00 o'clock in the morning, at which time defendant was noticeably under the influence of drink. The sheriff took the guns in the house and defendant's son went to look for the shotgun in the field described, but could not find it. The sheriff of Douglas County returned in the evening when it was noted that defendant had sobered up and the sheriff exercised his good offices in an attempt to affect a reconciliation.

In the meantime the defendant and his wife had engaged in conversation and there is some evidence that

they had agreed that she should stay at the home until after the crops were harvested.

On August 9th, the Sunday preceding the day of the shooting, the defendant is described as being nervous, and he testified that on that night he wrote what has been called the "suicide note" which he put into his wallet.

On the morning of August 10th, defendant testified that he was going to the elevator at Brockton to see about selling some corn so that he could make the down payment on an automobile for a daughter. His wife testified that he told her that he was going to Hume to see about some tile and that he would get breakfast when he returned. Defendant's testimony is that on the way to the elevator he stopped in the field and found the shotgun, which he put in his automobile then drove on to the elevator to sell the corn. The deceased, Wilkey, was employed at the elevator, and defendant arrived at about 7:00 a. m. In the elevator office he saw Wilkey for the first time since the 17th of July. As Wilkey went out the door of the office, defendant called to him and asked him if he was going to finish tearing down the old house that defendant had given to him and Wilkey said, according to defendant:

"Yeah, I'll be out there some of these days, and I am going to get everything out there anyway."

and defendant testified that Wilkey "kinda sneered at me." As decedent then walked away en route to some elevator out-building, defendant went to his car, got the shotgun and followed decedent, approaching within some 20 feet and shot decedent, who fell to the pavement. Defendant then walked up to him and discharged 2 more shells into the decedent. He then returned to his automobile and drove to his farm home and was located there by the sheriff of Douglas County within the hour. The defendant and his wife testified that he invited her into the yard, told her that he had killed Wilkey and that he would shoot her and himself, she ran and fell and that

169

they talked until the sheriff came. The sheriff testified that when he arrived at defendant's home, defendant and his wife were in each others arms and that the gun was leaning against a shed unloaded with 2 shells on the ground, and subsequently he obtained a third shell from defendant's pocket.

Dr. Greenfield interviewed the defendant on September 19, 1964, September 26th and October 3rd, each interview lasting approximately 1 hour and 20 minutes, and included physical and neurological examination made at the county jail. The diagnosis was a basically paranoid schizoid personality described as fundamental, i. e., with no demonstrable organic cause. The doctor defined paranoid as a character difficulty making the individual suspicious of people, jealous and with a sense of fear and insecurity. Schizophrenia is defined as a state of unreality where the mind cannot adhere to normal thoughts.

From his interviews Dr. Greenfield concluded that defendant had a poor image of himself, that he felt that he was disliked, ugly, was not intelligent, was suspicious of the motives of others, that he hated to be alone and possessed unexplained fears at night, that everyone was against him, and that his mother had rejected, or did not love him.

The doctor found that with this personality the defendant worked harder, acquired a farm of some 800 acres and economically became quite successful.

It was the opinion of Greenfield that on the date in issue, defendant was incapable of exercising "good reason and judgment and unable to control his acts in such a manner as to be within the law," that just prior to the shooting, defendant suffered an "acute schizophrenic panic state," i. e., a functional mental illness affecting the ability to control his actions, which state continued for a period of 2 or 3 days following the shooting.

It is the hypothesis of Dr. Greenfield that the defendant, just prior to the shooting, suffered from mental and

170

physical exhaustion resulting from emotional strain arising from repeated arguments with his wife and eating little food. He concluded that the defendant became withdrawn, wavered between suicide, homicide, reconciliation with his wife, and suffered from an increasing fear that he would lose his farm as well as his wife. Dr. Greenfield, assuming that Wilkey used the words testified to by the defendant, believed that upon Wilkey's statement, there was a psychotic break resulting from an overwhelming threat to defendant's security and that thereupon defendant became incompetent to control his action.

Defendant urges that the case must be reversed and remanded for new trial for error arising in the admission of the testimony of certain lay witnesses who were permitted to express an opinion upon the insanity of the defendant at times approximating the shooting. It is contended that the error arises in that these witnesses were not required to state the facts upon which such opinions were based. We note that these lay witnesses had known the defendant for periods ranging from 3 years to 20 years and included individuals with whom the defendant had transacted business upon a confidential, as well as a casual basis. In at least one instance, the testimony was from an individual who, with her husband, had been intimate social friends for several years. Dr. Greenfield had testified that during the period beginning on July 15th there was a marked change in the personality of the defendant wherein he became withdrawn, suffered emotional and physical exhaustion and anxiety. The several lay witnesses had observed the defendant's demeanor, conduct and manner of speaking during the week preceding the shooting, and on the morning thereof in everyday transactions and associations. None of the lay witnesses had noted any change in the conduct or demeanor of the defendant during the prodromal period testified to by Dr. Greenfield. Such testimony has been held competent. Walker v. Struthers, 273 Ill 387, 112 NE 961.

■■ The "facts and circumstances" which are necessary as a foundation for a lay opinion as to sanity seem to be essentially an opportunity for observation. King & Pillinger, Opinion Evidence in Illinois, p 220. Cleary, Handbook of Illinois Evidence, 1st Ed § 9–12, states that the lay witness must base his opinion upon his own observation which he is required first to state in sufficient detail to show knowledge of the mental condition of the person in question. In Peters v. Catt, 15 Ill2d 255, 154 NE2d 280, it is stated that the lay witness giving an opinion as to the mental condition of the testator must first testify to sufficient instances, facts or circumstances to indicate his opinion is not a guess, suspicion or speculation. The several lay witnesses generally testified to conversations regarding business transactions, the status of defendant's crops and the doing of members of his family, and the sheriff of Edgar County testified that as he took the defendant from Brockton to Paris, defendant was responsive to questions concerning his crops, his new automobile and his other affairs, and that defendant asked if he might have an attorney represent him and asked what attorney he should obtain. Similar conversations were deemed a sufficient opportunity to observe and sufficient foundation to rebut a presumption of insanity, in People v. Thomas, 409 Ill 473, 100 NE2d 588.

Defendant cites as authority for his position, People v. Phipps, 268 Ill 210, 109 NE 25, wherein it was contended that competent testimony offered in behalf of the defendant was excluded. From the opinion it appears that no witness so described was asked to express an opinion upon the issue of sanity. People v. Krauser, 315 Ill 485, 146 NE 593, is relied upon by the defendant. In that case a police officer who had no prior acquaintance with the defendant was permitted to express an opinion that the defendant was sane. It appears that the police officer, who had been present during an interview recorded by a stenographer, was not asked to state any facts upon

which he based an opinion, but rather the State's Attorney said: "I'll omit details," and simply asked for the opinion. Objection was made to the admission of such testimony. The court, holding this admission to be error, pointed out that there was no showing that the opinion was based upon what had occurred in the presence of the witness, or whether he had observed what did occur, and that such opinion might have been formed upon the basis of but a part of what occurred at the interview.

The record discloses that counsel for the defendant made no objection to the foundation for the testimony as to an opinion expressed by the lay witnesses, and we find that there was no substantial cross-examination of such witnesses as to the details of the transactions, observations or conversations upon which their several opinions were founded.

██ It has been held that it is primarily a question for the trial court to determine whether or not sufficient facts and circumstances have been stated by a lay witness to support an opinion of the sanity of a party, and that a reviewing court will not reverse unless there has been an abuse of discretion. Quellmalz v. First Nat. Bank of Belleville, 16 Ill2d 546, 158 NE2d 591; Anthony v. Anthony, 20 Ill2d 584, 170 NE2d 603.

██ The defendant also contends that the trial court erred in limiting the cross-examination of the lay witnesses as to the defendant's sanity. The record discloses that upon the trial, this matter was raised as to only one witness, William Morrell. He was an employee of the elevator where the shooting occurred, had known the defendant for some years and testified as to his observation of the defendant at the grain office immediately prior to the shooting and after the shooting. He expressed an opinion that at that time and place the defendant was sane. While there was virtually no cross-examination upon the observations or conversations or conduct observed, defendant's counsel asked: "What is acute schizo-

173

phrenic episode?" The trial court sustained the objection upon the ground that there had been no direct examination of the witness upon the subject. It is argued that by this question defendant was attempting to demonstrate to the jury the fact that the witness was incompetent to testify as to sanity. Strictly speaking, it is not for the jury to say whether or not the lay witness should be permitted to testify upon the issue of sanity, but rather such determination is the responsibility of the trial court. If, however, defendant was simply seeking to minimize the weight to be given by the testimony to the jury, inquiry into esoteric nomenclature is not the means recognized under the rules of cross-examination. The witness did not purport to testify to, or diagnose and identify mental illness, the existence of which is asserted by the defendant's psychiatrist, but rather testified to an opinion which was based upon an acquaintance extending over several years, and observation of the defendant immediately prior to and shortly after the shooting. The lay opinion of sanity is based on the absence of abnormal speech or conduct. King & Pillinger, Opinion Evidence in Illinois, p 223. See also Richardson, Modern Scientific Evidence, § 8.22. The record discloses that the trial court, in sustaining the objection to this line of cross-examination, suggested that counsel might inquire into the facts and circumstances to which the witness had testified. Such was not done for any practical purpose. People v. Morris, 30 Ill2d 406, 197 NE2d 433, and People v. Coli, 2 Ill2d 186, 117 NE2d 777, are cited for the rule that the defendant has the right of cross-examination as to any manner explaining or discrediting that which was said on direct examination. In each case the issue at hand was one of the identification of the defendant. In Morris, the Supreme Court held that the defendant should have been permitted to cross-examine upon the issue of the sobriety of the prosecuting witness. We read these authorities to mean that there

is the right to cross-examination upon any matter going to explain, modify or discredit what was said upon direct examination. It does not appear that the defendant's line of cross-examination here comes within this rule.

■ It is contended that since a psychiatrist expressed an opinion that defendant was not criminally responsible within the language of the statute at the time of the shooting, the court should have directed a verdict and should not have submitted the case to the jury. It is urged, that absent an impeachment of the psychiatrist's credentials, or the showing of a professional incompetence, this testimony introduces such a reasonable doubt in the minds of men that the case should be taken from the jury and the defendant found not guilty as a matter of law.

■ No Illinois cases are cited upon the issue by either of the parties. Such a proposition was urged in People v. Brislane, 295 Ill 241, 129 NE 185, wherein it was contended that evidence of defendant's insanity created a reasonable doubt as to guilt. The Supreme Court said, at page 247:

> "Whether there was a temporary insanity, produced immediately by intoxication, or a fixed insanity, are questions peculiarly for the jury to determine. . . ."

In People v. Thomas, 409 Ill 473, 100 NE2d 588, it was also contended that there had been a failure to prove defendant's insanity beyond a reasonable doubt. The court held that the question was one for the jury and that its verdict would not be disturbed unless it was so palpably against the weight of the evidence as to indicate that the verdict was based upon passion or prejudice. Certiorari was denied in the United States Supreme Court, 100 L Ed 758. See also People v. Muniz, 31 Ill2d 130, 198 NE 2d 855.

The defendant gives as authority for the proposition, United States v. Westerhausen, 283 F2d 844, where the court reversed the trial court for denial of a motion for acquittal. There the defendant had introduced substantial evidence of a long consistent history of insanity and the defendant had been certified as insane. The court noted that the quantum and nature of proof of insanity required to take the case to the jury varies depending upon the quantum and nature of proof of insanity, and that the government failed to offer sufficient evidence to sustain the conviction. This rule is not of universal application in the Federal Courts. In Dusky v. United States, 295 F2d 743, the court concluded that the issue should go to the jury where the evidence viewed fairly and as a whole, afforded permissible choices for the jury, and that it was proper to submit the issue to the jury, distinguishing that case from those wherein the evidence of insanity was so overwhelming that the issue should not be submitted to the jury. See also United States v. Robinson, 327 F2d 959, wherein it was held that the issue was properly presented to the jury upon lay testimony of sanity as opposed to expert testimony supporting the opinion of insanity. We believe that the rule in Illinois is stated in People v. Brislane. See also People v. Bacon, 293 Ill 210, 127 NE 386.

It is contended that this case must be reversed and remanded for a new trial by reason of the nature of an examination made of the defendant by Dr. Groves Smith, a psychiatrist acting at the request of the State's Attorney. This examination was made on September 23rd at the jail in Paris. It will be recalled that the first examination of Dr. Greenfield was on September 19th. The only evidence upon this examination was elicited from Dr. Smith upon cross-examination. He stated that he called at the jail and that he saw the defendant and asked his name. Dr. Smith identified himself as a doctor making an examination at the request of the State's At-

176

torney. Following such introduction, it appears that the defendant and the doctor had no conversation, but that for about 20 minutes there was silence and presumably, mutual observation. Dr. Smith then asked the defendant if he had ever been in the Army, Navy or Marine Corps, and said that the defendant shook his head to signify no. There followed another interval of silence and then the defendant asked to have the sheriff get his attorney. Dr. Smith testified that he stated that he would be glad to have the attorney present, and the latter arrived shortly. He testified that he told the attorney that he wished to examine the defendant with his permission, but that no further examination was conducted after such conversation. It appeared that the defendant stood mute.

It is urged that such examination deprived the defendant of the benefit of counsel in violation of the Sixth Amendment of the United States Constitution and of the Constitution of the State of Illinois, that defendant was deprived of due process under the Fourteenth Amendment and that the exam was not consonant with the provisions for medical examination in Supreme Court Rule 17–1(1).

The argument that Dr. Smith did not inform the defendant of his identity and that he was obtaining evidence from the defendant without the latter having knowledge thereof is not supported by the record.

While the argument makes no claim of violation of the privilege against self-incrimination under the Fifth Amendment to the United States Constitution, and art II, § 10 of the Constitution of Illinois, we believe that the presence or absence of the element of self-incrimination is a key factor in the resolution of this proposition.

In 8 Wigmore, Evidence, p 378, § 2263, it is stated that the privilege against self-incrimination is directed at the employment of legal process to extract from the person's lips an admission of guilt which would take the place of other evidence. The Supreme Court considered the issue of self-incrimination by reason of a mental

177

examination in People v. Krauser, 315 Ill 485, 146 NE 593. There two doctors examined the defendant at various times at the request of the State's Attorney. The doctor introduced himself as making the examination pursuant to such request. There was objection to the doctor testifying since the examinations were without the consent of the defendant and while he had none representing him, so that his rights were violated, and that such examination required the defendant to testify against himself. It was held that there was no violation of the privilege against self-incrimination for there was no testimonial compulsion involved. See also State v. Grayson, 239 NC 453, 803 SE2d 387; French v. District Court, 153 Colo 10, 384 P2d 268; State v. Myers, 220 SC 309, 32 ALR2d 430; Noelke v. State, 214 Ind 427, 15 NE2d 950. In People v. Greer, 28 Ill2d 107, 190 NE2d 742, it was held that the privilege against self-incrimination was not violated under art II, § 10 of the Illinois Constitution, when examination by special light was made of the hands of the defendant to show the presence of a fluorescent powder. It was pointed out that such evidence was beyond the privilege against self-incrimination as no testimonial capacity was called upon.

In People v. English, 31 Ill2d 301, 201 NE2d 455, the Supreme Court examined the statute relating to Sexually Dangerous Persons, chap 38, § 105 (Ill Rev Stats, 1965), and its provisions for a psychiatric examination. The court pointed out that such statute does not make provision for protection of the privilege against self-incrimination by a grant of immunity as to statements made during the examination provided by statute. Accordingly, the court held that under the statute, the defendant was not privileged from submitting to the examination, but that the privilege against self-incrimination protected the defendant from being required to make any statements to the psychiatrist which might incriminate him.

178

In the English case, the court pointed out that in chap 38, § 104–2 (Ill Rev Stats, 1965), relating to examinations to determine competency to stand trial, the statute provided a grant of immunity to the person examined under the provisions of that statute insofar as the results of the examination involved evidence upon issues of guilt. We have found no statutory provisions relating to a plea of not guilty by reason of insanity, and no statutory provisions for a psychiatric examination which might be relevant upon such issue. Supreme Court Rule 17, it is to be noted, does not contain any grant of immunity which would protect the privilege against self-incrimination in a criminal case as is found in chap 38, § 104–2(d), (Ill Rev Stats, 1965). The Supreme Court has indicated that a court has no power to grant judicial immunity, People v. English, 31 Ill2d 301 at p 308, 201 NE2d 455. Assuming, therefore, that Dr. Smith had been appointed under the general powers of the court as in People ex rel. Noren v. Dempsey, 10 Ill2d 288, 139 NE2d 780, or under Rule 17, the privilege against self-incrimination would necessarily be protected by standing mute as authorized in People v. English. This defendant did, substantially and effectually, both at the interview in issue, and in the subsequent interviews with court appointed psychiatrists.

It appears, therefore, under the authorities that the occasion when Dr. Smith and the defendant mutually observed one another prior to the arriving of defendant's counsel, there was, in fact, no testimonial compulsion as to inculpating matters. There being no valid question of constitutional dimensions upon the issue of self-incrimination, we believe that the issue raised as to the deprivation of the benefit of counsel is controlled by Schmerber v. California, 86 US 1826, 16 L Ed2d 908. In that case defendant was arrested at a hospital while receiving treatment for injuries suffered in an automobile collision. At the direction of a police officer, a physician at the hospital

179

took a blood sample from the petitioner and the chemical analysis disclosed sufficient alcohol in the blood to indicate intoxication. The evidence of this analysis was admitted into evidence at the trial. Defendant objected on the ground that the blood had been taken despite his refusal on advice of counsel to submit to the test, contending that there was a denial of due process under the Fourteenth Amendment, a denial of his privilege against self-incrimination under the Fifth Amendment, and of his right to counsel under the Sixth Amendment. The Supreme Court held that there was no violation of the privilege against self-incrimination for the reason that such privilege guarantees the right to remain silent unless he chooses to speak, but that the evidence from the blood sample did not come within the privilege. The court then considered the contention that the defendant was deprived of his right to counsel under the Sixth Amendment. It held that since he was not entitled to assert the privilege against self-incrimination, there was no issue of denial of counsel's assistance in respect to any rights that defendant did possess, and the claim of violation of the Sixth Amendment was denied. Here, as in Schmerber, no issue of counsel's ability to assist in respect of any right which he did possess was presented. It may be noted that if the provisions of Rule 17 had been followed in this case, there is no authority under the Rule for counsel to be present at the examination as is apparently urged here. The cases cited by defendant in support of his position that defendant was deprived of counsel include Gideon v. Wainwright, 372 US 335, 9 L Ed2d 799, wherein no counsel had been appointed for an indigent defendant at any time during the trial. In the other instances which might be relevant, we find in Escobedo v. Illinois, 378 US 478, 12 L Ed2d 977; Messiah v. United States, 377 US 201, 12 L Ed2d 246; Spano v. New York, 360 US 315, 3 L Ed2d 1265; and People v. Waterman, 9 NY2d 561, 175 NE2d 445, that in each case incriminating

180

statements or confessions had been obtained when defendant had no counsel, or counsel had been absent. In each instance the evidence came from the lips of the defendant.

Upon the issue of the denial of due process under the Fourteenth Amendment, we are cited to Rochin v. California, 342 US 165, 96 L Ed 183, 25 ALR2d 1396. In that case sufficient force was used to compel the defendant to have his stomach pumped, and the narcotic pills, as the result of such process, were admitted into evidence. We do not believe that such facts make this case in any way comparable to Rochin.

 While the procedure followed by the State's Attorney was possibly not the most desirable, still there was unmodified precedent in this State, People v. Krauser, 315 Ill 485, 146 NE 593, for the steps taken, and we cannot, in the exercise of judgment upon the whole course of proceedings, conclude that there was an actual deprivation of defendant's constitutional rights, nor any offense to canons of decency, fairness and conscience. A judgment will not be reversed because of absence of counsel where there is no possibility of prejudice to the defendant. People v. Taylor, 32 Ill2d 165, 204 NE2d 734; Walton v. United States, 202 F2d 18.

Defendant urges that the case must be reversed and remanded by reason of error in the trial court in refusing to give an instruction defining manslaughter in essentially the words of the Criminal Code, chap 38, § 9–2(a), (Ill Rev Stats, 1965), i. e., killing if:

> ". . . acting under a sudden and intense passion resulting from serious provocation by:

> "(1) The individual killed, . . ."

 It is argued that although the jury might reject the testimony of Dr. Greenfield that the defendant was insane, it could, nevertheless, accept such testimony with

181

the other evidence and conclude that the defendant was acting under intense passion occasioned by the intimacy of the defendant's wife and the deceased. While counsel cites certain authorities upon the giving of instructions as to the theory of the case, no authorities are cited in terms of provocation. The evidence is clear that defendant was not acting in response to any physical injury and that decedent was, for practical purposes, shot in the back as he was walking away from the scene. As to the conversation upon the occasion, no matter how it may be interpreted, words do not constitute such provocation as would make the offense manslaughter. People v. Phipps, 268 Ill 210, 109 NE 25; People v. McMurry, 64 Ill App2d 248, 212 NE2d 7.

Defendant refers to the drafting comments which follow chap 38, § 9–2 (Ill Rev Stats, 1965), relating to "serious provocation" as including the category:

". . . adultery with the offender's spouse. . . ."

No Illinois cases upon such form of provocation cited either by the defendant, or in the commenting note, refer to adultery as "serious provocation." Adultery with a spouse as provocation generally has been limited to those instances where the parties were discovered in their act of adultery, or immediately before or after its commission, and the killing must have followed immediately upon detection. 26 Am Jur 174, Homicide, § 28; 29 CJ 1142, Homicide, § 125.

Here the event initiating the series of events occurred some three weeks before the shooting and the wife's confession occurred five days prior thereto. The record discloses that the defendant had not seen the deceased from July 17th to just before the shooting on August 10th, and that there had been time for his immediate anger to cool is shown by the testimony of defendant's wife, that the defendant had suggested to her that the three of them

meet to straighten out their affairs. Further, she and the defendant had discussed their plan that they stay together until after the harvest.

Dr. Greenfield's testimony takes into account the alleged emotional strain induced in the defendant by his continuing "arguments" with his wife. A daughter of the defendant describes "arguments" as being essentially name-calling. Defendant's wife testified that most of defendant's resentment was against her, and that the latter became angry because she would not agree to "cuss out" Wilkey, and that, in fact, defendant did not say much about Wilkey for the last few days prior to August 10th.

██ ██ We do not believe that passion engendered by the conduct of persons other than the decedent can be made into provocation within the language of chap 38, § 9–2 (Ill Rev Stats, 1965), and we must conclude that examination of the record discloses no evidence which authorizes the giving of an instruction as to manslaughter. People v. Strader, 23 Ill2d 13, 177 NE2d 126; People v. Turner, 60 Ill App2d 388, 208 NE2d 406.

██ We have examined the record with care and find numerous matters of evidence contradicting directly, or inferentially, defendant's account of his state of mind and his explanation excusing his conduct. It is to be noted that he engaged in personal and other business activities, and that his social activities were as frequent as before. The language of the so-called "suicide note" does not, in fact, refer to suicide, and upon the event it may be said to be consistent with what transpired. It does not appear, therefore, that the verdict of the jury is contrary to the evidence, and we conclude that the several errors argued do not constitute reversible error.

The judgment of the trial court is affirmed.

SMITH and CRAVEN, JJ., concur.