THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MAJOR PEERY, Defendant-Appellant.

(No. 56970; ■■■■■■■■

First District (3rd Division)—April 26, 1973.

Charlotte Adelman, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago, (Robin K. Auld, Assistant State's Attorney, of counsel,) for the People.

Mr. JUSTICE McGLOON delivered the opinion of the court:

The defendant, Major Peery, was indicted for the murder of his wife (Ill. Rev. Stat. 1969, ch. 38, par. 9—1), and after a jury trial he was convicted and sentenced to the Illinois State Penitentiary for a term of 100 to 150 years. In this appeal the defendant alleges that three instances of reversible error occurred during the trial and also that the sentence he received was excessive. The most important issue raised by the defendant, because it is dispositive of this case, is whether the trial court erred in refusing to give the defendant's offered jury instruction encompassing the lesser included offense of voluntary manslaughter.

We reverse and remand.

The relevant facts adduced at trial are as follows: The defendant and his wife, Lovell Peery, had been married for 18 years at the time of the alleged offense. During their marriage they had seven children, and an eighth, Henry Williams, Jr., was Mrs. Peery's son born of a previous marriage. Sometime during February, 1971, the defendant and his wife separated and lived apart until the end of March.

On the evening of March 31, 1971, Lovell Peery was visiting her daughter and son-in-law, Gail and Timothy Jackson, at their home a short distance away from the Peery family home, where the defendant and one of his daughters still resided. In the kitchen of the Jackson home that evening were Mr. and Mrs. Jackson, Mrs. Peery and two of her

daughters, Margaret and Tujuana Peery. Shortly after 7:00 P.M. or 8:00 P.M. Patricia Peery, a fourth daughter of the defendant and Lovell Peery, rang the doorbell at the Jackson apartment. Patricia had encountered her father, the defendant, while on her way to her sister's home, and he had told her that he also was on his way to the Jackson's to bring Margaret back to live with him.

Patricia further testified that she and her father proceeded together to the Jackson's, and as she rang the doorbell, the defendant stood behind her and out of sight. When Gail opened the door, the defendant ran through the door and pushed his way to the kitchen. Patricia followed him as far as the living room and observed the ensuing events from there.

Timothy Jackson testified that he was in the kitchen when the defendant entered and observed the following events. Lovell Peery was standing, with her arms folded, in the corner near the kitchen sink. The defendant positioned himself against a wall a few feet away from her. After the defendant entered, he and Mrs. Peery began to argue about family matters. The exchange grew louder until Gail Jackson cautioned her mother to keep her voice down. Jackson testified that the defendant continued in a loud voice demanding to know why his wife was keeping the children from him. The defendant also accused his wife of staying out with other men, which she denied. Jackson further testified that suddenly, for no explainable reason, the defendant said, "Why are you going into the sink?", and drew a pocket knife, crossed the room in three quick steps and began stabbing Mrs. Peery.

Gail Jackson testified that after entering the apartment the defendant proceeded to the kitchen and began arguing with her mother. The defendant accused his wife of keeping the children from him. He had arrived angry, but he calmed down during the conversation. He made no threats to Mrs. Peery during their conversation. Then, suddenly, he asked, "What are you going to the sink for?" He then approached Mrs. Peery and began stabbing her with a knife he took from his pocket.

Patricia Peery testified that she observed the events as they occurred, and she recounted substantially the same story. Her father was speaking in a normal tone, and then he asked her mother why she was going to the sink. He then walked to the sink, grabbed her and started stabbing her.

The testimony of Margaret Peery was similar to that of the previous occurrence witnesses. She heard her father say something like, "Why are you going into the sink?" She added that the sink had contained, among other things, a knife.

At this point, as the defendant approached his wife, the witnesses realized what was happening and naturally became quite excited. The

girls began screaming, "Daddy, Mama, stop; Daddy and Mother, stop." Patricia Peery hit the defendant on the head with a large kitchen spoon; Gail Peery hit him with a kitchen chair. Timothy Jackson got the girls out of the apartment as the defendant continued to stab his victim.

Minutes afterwards, the defendant left the Jackson apartment and walked to his home. The police were called, and he was arrested. He was taken to a nearby hospital where he received five stitches to close a cut on his head.

Dr. Jerry Kearns testified that he was the pathologist who examined the body of Lovell Peery. He found two stab wounds, one to the chest and one to the neck, which were the cause of death.

The defense called as its only witness the defendant. He testified that he went to the Jackson home on the evening of March 31, 1971, to tell his wife that he wanted the children to live with him. He further testified that after their conversation, he turned to leave when his wife called his name and said, "Anyway, I made up my mind to kill you." She reached into the sink, and he asked, "What are you reaching into the sink for?" She then raised her arm over her head and struck him on the head with a heavy object. The blow blinded him. The next thing he could remember was that he was outside walking home. He was bleeding from the top of his head. When he got home, he called the police and went outside when they arrived and submitted peacefully to arrest.

■■ During the conference on jury instructions, the defendant submitted an instruction defining the lesser included offense of voluntary manslaughter. The State objected to the instruction, and the trial judge rejected the proposed instruction "[b]ased upon the facts heard." In this appeal the defendant's contention is that it was reversible error to refuse the voluntary manslaughter instruction. In support of the decision of the trial court, the State argues that there was no evidence tending to prove the lesser offense.

> "It is the settled rule in homicide cases that if there is evidence in the record which, if believed by the jury, would reduce the crime to manslaughter, an instruction defining manslaughter should be given. (*People v. DeRosa*, 378 Ill. 557; *People v. Pursley*, 302 id. 62; *People v. Bacon*, 293 id. 210). The defendant was entitled to the benefit of any defense shown by the evidence, even if inconsistent with his own testimony. *People v. Scalisi*, 324 Ill. 131.
>
> The question, then, is whether or not there is any evidence which, if believed by the jury, would reduce the offense from murder to manslaughter. If there is such evidence, then it was

error on the part of the court to refuse the offered instructions relating to manslaughter. *People v. Papas* (1942), 381 Ill. 90, at 94, 95, 44 N.E.2d 896. See also, *People v. Bembroy* (1972), 4 Ill. App.3d 522, 281 N.E.2d 389."

In the instant case, the State's witnesses testified that there had been an argument between Mr. and Mrs. Peery before the stabbing. Mrs. Peery had been cautioned to keep her voice down. Gail Peery, a State's witness, testified that the defendant made no threats to his wife during the argument. All of the State's occurrence witnesses testified that immediately before the stabbing the defendant suddenly asked Mrs. Peery why she was going into or near the sink. The defendant testified that although he had no memory of stabbing his wife, he did remember that she threatened to kill him, and then reached into the sink and struck him on the head with a heavy object. Had the jury been properly instructed, this testimony might have been sufficient, in their minds, to reduce the homicide to manslaughter.

■■ Even though the evidence was conflicting, the defendant's trial testimony, if believed by the jury, was sufficient to create an issue of fact as to whether he acted under a sudden and intense passion resulting from a serious provocation as defined in the statute. Ill. Rev. Stat. 1969, ch. 38, par. 9—2(a). *People v. Boothe* (1972), 7 Ill.App.3d 401, 287 N.E.2d 289.

■■ As was pointed out by the court in *Papas* (1942), 381 Ill. 90, 44 N.E.2d 896, in a jury trial it is the province of the jury, and not the judge, to determine the guilt or innocence of the accused and also to determine whether the accused is guilty of murder or the lesser crime of manslaughter, "if there is any evidence which tends to prove the lesser rather than the greater crime." 381 Ill.90 at 96.

The province of the jury to determine the weight to be given the testimony of the various witnesses was definitely invaded by the refusal of the court to give the voluntary manslaughter instruction offered by the defendant. The defendant was entitled to have submitted to the jury any defense which his testimony, or any other evidence, tended to prove.

We, therefore, reverse and remand for a new trial for failure to properly instruct the jury.

Judgment reversed and remanded.

DEMPSEY, P. J., and McNAMARA, J., concur.