THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CHARLES JENKINS, Defendant-Appellant.

(No. 12376;

Fourth District—August 14, 1975.

CRAVEN, J., concurring in part and dissenting in part.

Richard J. Wilson and John L. Swartz, both of State Appellate Defender's Office, of Springfield, for appellant.

Paul R. Welch, State's Attorney, of Bloomington (G. Michael Prall, of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE GREEN delivered the opinion of the court:

Defendant Charles Jenkins was convicted of murder by the McLean County circuit court and sentenced to 14 to 25 years' imprisonment. He appeals the conviction on the grounds that the trial court erred in denying defendant's tendered instructions on voluntary and involuntary manslaughter, that he was not proven guilty of murder beyond a reasonable doubt, and that he should have been allowed discovery of certain police reports.

At about 10:30 p.m. on August 17, 1972, defendant went to the apartment of his wife, Virginia Jenkins, from whom he had been separated for several weeks and who had filed for divorce. He entered the second-story apartment through a rear window. Defendant testified that the apartment looked dark and he expected to find no one there because his wife and infant daughter had been staying with his wife's mother. Defendant testified that he entered the apartment through the window because he did not have a key. He also said that he went to the apartment because "I was thinking about my daughter and my wife, my daughter would have been six months old the next day, and I just wanted to go home where I belonged, where I used to live with my wife."

Mary Lou Pacher, a babysitter, was in the apartment with defendant's daughter when defendant entered. Defendant asked the babysitter where his wife was. Although the testimony of defendant and the babysitter is somewhat conflicting on this point, the babysitter apparently told defendant that his wife was at the State Fair with the deceased, George West.

Defendant remained at the apartment for several hours until his wife returned. During that time he threw away a rose that had been given to his wife by West. He also drank some beer, played with the baby, and carried around a paring knife he found in the kitchen. According to the babysitter, he occasionally looked out of the front window to see if his wife was coming. Defendant turned the lights off in the apartment because "if the lights were off I figured Virginia would come up to the

apartment by herself without George or anybody, because she would think the babysitter was in bed. And, I wanted to talk to Virginia alone."

Defendant asked the babysitter to leave several times, and finally she left. She testified that defendant said he wanted "to get Virginia and George West in one way or the other and he wanted me to go home because he did not want me to get hurt." However, she admitted that defendant did not use any force to get her to leave.

A few minutes after the babysitter left, defendant's wife returned from the State Fair. She drove her own car, and West followed in his car. She noticed that the lights were out in the apartment. She went upstairs to the apartment and West remained in his car. When Mrs. Jenkins opened the apartment door, defendant pulled her inside the apartment and slammed the door. Defendant held the paring knife against Mrs. Jenkins' throat and began to ask her "how come she was running around with George again, and where George was, where she had been." When Mrs. Jenkins told him that West was out in the car, he took her to the front window and told her to yell down to West to tell him to leave. Defendant testified that he wanted West to leave so he could talk to his wife alone. Defendant then heard footsteps on the stairs and led his wife to the door to tell West to leave. Mrs. Jenkins then ran out of the apartment and down the stairs. Defendant followed her and met West on the landing.

Defendant is the only witness to what next occurred. Defendant recalled that he still had the knife in his hand at that time. West, who weighed approximately 350 pounds, took hold of defendant's upper arms but defendant threw up his arms and broke the hold. There was a scuffle which lasted for only a few seconds, then defendant broke away and ran downstairs after his wife. He did not remember stabbing West. Defendant testified that he did not have the knife when he ran downstairs. George West also came down the stairs and fell as he went outside. He had a stab wound on the left side of his back. Mrs. Jenkins ran to West's car and got in. She looked back and saw West fall. As she prepared to drive away, defendant ran to the car and took hold of the door handle on the passenger's side. Mrs. Jenkins testified that the car window was open and that defendant reached inside with the knife in his hand. As defendant tried to enter the car, Mrs. Jenkins drove away, and defendant was pinned between West's car and another car parked on the street. Defendant stated that the next thing he remembered was being in the hospital with a back injury. A paring knife was later found in the back seat of West's car. Defendant was arrested by the Bloomington police. He escaped from the hospital where he was taken for treatment of the back injury, and was apprehended in Chicago.

West's wound at first appeared superficial, but later a nick was found on his left kidney. Complications developed, and West died on August 28, 1972.

Mrs. Jenkins testified that at the time of the trial she was 19 years old and her husband 21. She and her husband had known West, who was in his early forties, for about 4 years, and her husband and West had been good friends up until the stabbing incident. She also said that she had often talked with West about her marital difficulties, but had not dated him. West had sent her a rose on the day of the stabbing and had given her other gifts, including a diamond cocktail ring.

She also testified that about 2 weeks before the stabbing incident she was in the car with defendant when he tried to get her to go out into the country with him and told her "that he was going to do a job on [her]" and that she "would never belong to anyone else."

Defendant related another incident which had occurred in late July, 1972. He saw his wife and George West in a car and told them to stop because he wanted to talk to his wife. Mrs. Jenkins got out of the car, and defendant asked her where she had been. When she replied that it was none of his business, he slapped her and she fell. West then started to get out of the car. Defendant threatened West with a motorcycle chain belt, and West got back into the car.

■■ Defendant offered instructions on voluntary and involuntary manslaughter, which were refused by the trial court. The general rule is that in a murder trial it is error to refuse instructions on manslaughter if there is any evidence in the record which, if believed, would reduce the crime to the lesser offense (*People v. Canada*, 26 Ill.2d 491, 187 N.E.2d 243). The instruction should be given even though the theory of the defense at trial is inconsistent with the possibility that the defendant is guilty of the lesser offense. (*People v. Scalisi*, 324 Ill. 131, 154 N.E. 715). However, it is also well settled that where there is no evidence to support the lesser included offense, it is error to instruct the jury on it. *People v. Handley*, 51 Ill.2d 229, 282 N.E.2d 131.

Section 9—2 of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, par. 9—2(a)) defines voluntary manslaughter as follows:

"A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) The individual killed, or

(2) Another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

Serious provocation is conduct sufficient to excite an intense passion in a reasonable person."

The drafting comments to section 9—2 indicate that only certain categories of provocation were generally recognized at common law as a basis for voluntary manslaughter—substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse. However, in Illinois there were no reported cases considering any categories of provocation other than those involving actual or threatened physical harm. The drafting comments also state that the language of section 9—2 was based on the common law and was intended to be broad enough to include the other categories of provocation.

Defendant here contends that there was "serious provocation" because West had been out with defendant's wife on the night of the stabbing incident. This could only be considered as such a provocation if adultery were involved. However, even since the adoption of section 9—2 there have been no cases recognizing adultery as a "serious provocation." (See *People v. Wax*, 75 Ill.App.2d 163, 220 N.E.2d 600.) Moreover, as this court's opinion in *Wax* pointed out, even in jurisdictions where adultery has been recognized as a provocation it "generally has been limited to those instances where the parties were discovered in their act of adultery, or immediately before or after its commission, and the killing must have followed immediately upon detection." (75 Ill.App.2d 163, 182, 220 N.E.2d 600, 610.) In the instant case defendant did not testify that he thought there had been any adultery between West and his wife on the evening of the stabbing incident, nor was any other evidence of such adultery presented. Defendant's testimony indicated that he objected to West's presence not because he suspected adultery but because West was interfering with his desire to talk to his wife alone about their marital difficulties.

Defendant also argues that the physical struggle with West constituted a "serious provocation." The question here is whether defendant's confrontation with West on the landing involved such a threat of physical injury to defendant as to arouse a sudden and intense passion in a reasonable person. In those cases where the courts have held that there was sufficient evidence to require that the jury be instructed on voluntary manslaughter the actual or threatened physical harm has been severe. *People v. Canada*, 26 Ill.2d 491, 187 N.E.2d 243 (evidence that at time of killing deceased may have been armed with a hammer or hatchet or both); *People v. Peery*, 11 Ill.App.3d 730, 297 N.E.2d 643 (testimony of defendant that deceased reached into sink and hit him with heavy object just before the stabbing); *People v. Boothe*, 7

Ill.App.3d 401, 287 N.E.2d 289 (defendant's testimony that deceased attacked him with a knife while they were fighting and evidence of other incidents where deceased was armed with a knife).

On the other hand, the following circumstances have been held not to meet the requirements for "serious confrontation": evidence that deceased knocked two assailants and choked one of them while being beaten for over 20 minutes by four defendants (*People v. Handley*, 51 Ill.2d 229, 282 N.E.2d 131) and defendant's testimony that deceased hollered and waved his hand in defendant's face (*People v. Matthews*, 21 Ill.App.3d 249, 314 N.E.2d 15).

■■ In the instant case defendant testified that West grabbed defendant's upper arms as defendant chased his wife out of the apartment. Defendant was armed with a knife and West was unarmed. Defendant raised his arms and broke West's hold and struggled with him for a few seconds. There was no testimony that West attacked defendant or tried to injure him. Defendant's testimony was to the effect that West got in his way and tried to stop him. Thus, we find no evidence to support a voluntary manslaughter instruction on the basis of a physical attack on defendant by the deceased.

We next consider defendant's contention that the trial court erred in refusing his instructions on involuntary manslaughter. A person commits involuntary manslaughter when he "kills an individual without lawful justification * * * if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." (Ill. Rev. Stat. 1973, ch. 38, par. 9—3(a).) Recklessness is defined by section 4—6 of the Criminal Code (Ill. Rev. Stat. 1973, ch. 38, par 4—6):

> "A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation * * *."

The question presented, therefore, is whether the record contains any evidence of acts by the defendant which, if believed by the jury, could reasonably be concluded to be reckless conduct within the above definition, and those acts caused the death of George West. In *People v. Bembroy*, 4 Ill.App.3d 522, 281 N.E.2d 389, the refusal of an involuntary manslaughter instruction was held to be error where defendant testified that he had been drinking heavily, that he had left a loaded gun which he knew to be defective lying on a chair, that just prior to his daughter's death he attempted to transfer the gun to a trunk across the room, that

he carried the gun with his finger on the trigger while talking to another person, and that in doing so the gun was pointed in the direction of his daughter and discharged. In *Bembroy* there was also conflicting evidence that after defendant had been drinking with his daughter and several other young women for several hours, and after they had refused his illicit sexual propositions, he picked up a gun threatening to kill them all, that he pointed it at one of the girls and pulled the trigger, but the gun misfired, that he pointed it at another girl and the gun again misfired, and that he then pointed it at his daughter and the gun fired, fatally wounding her in the chest.

■■ In the instant case defendant argues that he acted recklessly in carrying around the knife, holding it near his wife, and continuing to hold it while confronting West. Defendant testified that he held the knife on his wife in order to get her to tell West to leave so that he could talk to her alone. There was also evidence that defendant was pursuing his wife with the knife when West tried to stop him and that defendant sought to break away from West and continue the pursuit. The evidence of what actually happened is circumstantial. If defendant's testimony is believed a jury might well conclude that defendant knew or should have known that handling a knife in such fashion created a strong probability of death or great bodily harm. It is therefore our judgment that there is sufficient evidence in the record to support a jury verdict of either murder or involuntary manslaughter. As we said in *People v. Guthrie*, "It is not our province to determine which verdict is proper. It is for the jury to make the choice between two different concepts or theories as to what crime this evidence actually discloses." (123 Ill.App. 2d 407, 413, 258 N.E.2d 802, 805.) The failure to submit the issue to the jury requires a new trial.

Defendant further contends that the court erred in not requiring disclosure of certain police reports and that the court's procedure in examining the material in question did not comply with the Supreme Court Rules on discovery. Prior to trial the State revealed that the prosecution file contained additional police reports which were not being disclosed on the ground that they did not contain substantially verbatim statements of witnesses. In anticipation of a defense motion for an *in camera* examination of the material by the court, the State made the material available to the court at a pretrial hearing. After examining the material in question the court ordered that one page be furnished to defendant as a "report of a witness" and that the rest be sealed and made a part of the record. At the pretrial conference, defendant again moved for disclosure of the material. In response the State argued that the only state-

ments contained in the undisclosed police reports were those of the deceased, which could not be used to impeach because the declarant was dead and that there was nothing in the material favorable to defendant. The court again denied disclosure.

The State contends that this issue was waived by failure to raise it below. However, although defendant did not object to the procedure used by the trial court in determining whether the material should be disclosed, his post-trial motion asserted that the court erred in denying disclosure.

▪▪ Prior to argument on appeal defendant moved for disclosure by this court. We determined that no error had been made by the trial court in denying disclosure and also denied defendant access to the material for use in preparing his appeal. We affirm that ruling here. We have examined the disputed police reports in light of the entire record in this case and have found that they contain no information subject to disclosure under Supreme Court Rule 412. The only page which contains a statement not disclosed to defendant by other documents produced by the State is the page numbered X-11, which consists of a police report summarizing the deceased's account of the stabbing incident. Ordinarily such a report would be subject to disclosure as a substantially verbatim report of a witness' statement for defendant's use in impeachment. (*People v. Bassett,* 56 Ill.2d 285, 307 N.E.2d 359.) However, in the instant case the statement could not be admitted at the trial for the purpose of impeachment because the declarant was deceased and therefore could not be called as a witness. Page X-11 also contains no favorable information requiring its disclosure under *Brady v. Maryland,* 373 U.S. 83, 10 L.Ed.2d 215, 83 S.Ct. 1194, nor any other information requiring its disclosure under Rule 412. None of the other pages of material denied disclosure contains any information not provided to defendant in more complete form in other documents produced by the State. We conclude that the denial of disclosure complained of had no adverse effect on either the conduct of defendant's trial or the preparation of his appeal.

Defendant also misconstrues the procedures required under the discovery rules. He argues that Rule 415(f) was violated because defendant's counsel was not present when the court examined the disputed material. Rule 415(f) provides:

> "Upon request of any person, the court may permit any showing of cause for denial or regulation of disclosures, or portion of such showing, to be made *in camera.* A record shall be made of such proceedings. If the court enters an order granting relief following a showing *in camera,* the entire record of such showing shall be

sealed, impounded, and preserved in the records of the court, to be made available to the reviewing court in the event of an appeal."

As the language quoted above indicates, Rule 415(f) sets forth procedures for *in camera* "proceedings," that is, arguments and showings by the parties relating to the discoverability of the challenged material. It does not regulate the actual viewing of the disputed material by the court. In the instant case defendant's counsel stated at a pretrial hearing that he planned to file a written motion for an *in camera* examination of the denied material. The State then indicated that it was willing to furnish the material to the court without the necessity of filing a written motion. Defendant's counsel was present and given the opportunity to offer arguments. The court then took the material and examined it in private. Thus, all of the "proceedings" took place in open court, and Rule 415(f) is not applicable. Only the actual viewing of the documents by the court occurred in private.

In relying on Rule 415(f) defendant completely ignores Rule 412 (a)(i) which specifically authorized *in camera* examination of material claimed by the State not to contain substantially verbatim reports of witnesses' oral statements. Rule 412(a)(i) provides:

"Upon written motion of defense counsel memoranda reporting or summarizing oral statements shall be examined by the court *in camera* and if found to be substantially verbatim reports of oral statements shall be disclosed to defense counsel."

This procedure was followed in the instant case.

■■ No reference is made in Rule 412(a)(i) to any requirement that defense counsel be present for the actual viewing of the contested material by the court. In arguing that defendant's counsel shall have been present when the court examined the documents in question, defendant seems to be contending that his counsel should have been allowed to view the documents. The mere presence of defendant's counsel in the same room with the judge would serve no purpose. However, none of the cases cited by defendant for the proposition that proceedings to determine the discoverability of disputed material should be conducted in the presence of counsel for both parties go so far as to require that defendant's counsel be allowed to examine the disputed material. Indeed, such a requirement would completely defeat the purpose of *in camera* examinations.

The Supreme Court Rules on criminal appeals (Ill. Rev. Stat. 1973, ch. 110A, pars. 601—661) make no provision for the procedure to be used by the reviewing court in examining material ruled by the trial court not to be subject to disclosure. However, the same considerations

come into play here as in the trial court. To allow defense counsel to view the material on appeal before such time as it is ruled discoverable would also vitiate the purpose of *in camera* examinations.

In view of our holding that the issue of involuntary manslaughter should have been submitted to the jury, the judgment of the trial court is reversed and the cause remanded for new trial in accordance with the view herein expressed.

Reversed and remanded.

TRAPP, P. J., concurs.

Mr. JUSTICE CRAVEN, concurring in part, dissenting in part:

I agree with the majority that the instruction error requires a reversal and remandment for a new trial.

My only disagreement with the majority opinion relates to the discussion concerning discovery. As I view this record, the trial court was in error in denying the defendant access to the impounded material under the rules relating to the discovery. This court then compounded the error by imposing upon appellate counsel the impossible task of briefing the issue of the discoverability of the impounded material and concurrently denying access to that material. There is no reasonable way that the action of the trial court can be examined by appellate counsel without having access to the material. I take it under the majority opinion and the interlocutory order of this court that I am precluded from discussing with any specificity the content of the material denied to trial and appellate counsel. It is fair to say, however, that the particular material denied was not a work product, did not relate to informants nor national security, and were items not precluded from discovery under our rules. Indeed, it appears to me that the only plausible reason to deny discovery was the cumulative nature of the information rather than any compelling reason to keep it a secret. Such circumstance clearly mandates discovery, not the impoundment of the reports.

The object and purpose of discovery in criminal cases is to give the defendant a fair trial, to seek the truth, and to eliminate tactical advantage. Under the Supreme Court Rules applicable to discovery and upon the authority of *People v. Bassett*, 56 Ill.2d 285, 307 N.E.2d 359, and *People v. Schmidt*, 56 Ill.2d 572, 309 N.E.2d 537, it was error to deny discovery at trial and in this court.