THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* TIMOTHY D. BUSS, Defendant-Appellant.

Third District No. 82—206

Opinion filed February 9, 1983.

Lawrence G. Dirksen, of Olympia Fields, for appellant.

L. Patrick Power, State's Attorney, of Kankakee (John X. Breslin and Gerry R. Arnold, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

PRESIDING JUSTICE BARRY delivered the opinion of the court:

Timothy Buss, age 13 at the time of the instant offense, was arrested on May 28, 1981, in connection with the murder of five-year-old Tara Sue Huffman. Following a hearing conducted pursuant to

section 2—7(3) of the Juvenile Court Act (Ill. Rev. Stat. 1979, ch. 37, par. 702—7(3)), defendant's case was transferred from the juvenile division to the court's adult division, and he was formally indicted by a grand jury in Kankakee County in three counts for the child's murder. Because of pretrial publicity, the jury trial was held in Will County. Defendant was found guilty, convicted, and sentenced to a 25-year term of imprisonment.

On appeal, defendant raises five issues for our consideration: (1) whether the State's evidence was sufficient to prove the defendant guilty beyond a reasonable doubt; (2) whether the defendant was denied a fair trial by the trial court's denial of defendant's motion *in limine* to preclude the State's use of his pre-arrest statement; (3) whether defendant was denied a fair trial by the prosecution's suppression of certain witness interview notes taken by assistant state's attorneys; (4) whether the trial court erred in denying defendant's motion for mistrial based on prosecutorial and judicial misconduct; and (5) whether the trial court erred in denying defendant's motion for a directed verdict.

Because the defendant's conviction was obtained on the basis of entirely circumstantial evidence, we proceed with great caution in deciding defendant's first issue. Several witnesses were called by the State to testify about events of May 21, 1981, in a certain neighborhood on the east side of Bradley, Illinois. Around 9:30 a.m., Tara Sue Huffman, along with a chaperone and other kindergarteners who had perfect attendance records, rode a bus to a roller skating rink. The children skated until around 11:30, when they stopped to eat. Tara had a hot dog and Pepsi. They all left the rink together and returned to the kindergarten classroom at Bradley East around noon.

At 12:15 p.m., Tara was picked up by her sister and her mother. The three of them stopped at some neighborhood garage sales and returned to the Huffman home around 1:30. Tara changed into a pair of shorts and top, told her mother she was going to play with the Smith children, and headed down the alley, barefooted, in the direction of the Allen Smith residence.

Tara's brother, Richard Huffman, came home around 2:30 p.m. with a little turtle that he wanted to give to Tara. Mrs. Huffman phoned the Smith's and asked for Tara. She was told that Tara hadn't been there for some time. Not satisfied by this response, Mrs. Huffman went over to the house. Homer Smith, Allen's son, told Mrs. Huffman that he hadn't seen Tara for a while, but he had not seen her leave the yard.

At that point Mrs. Huffman began searching at the homes of

other neighbors. No one was able to provide any information on the little girl's whereabouts. At 5 p.m., Mrs. Huffman called the police and then continued her search of the neighborhood, aided by several neighbors and her children, Richard and Sondra.

At 7:15 p.m., Tara's body was found by defendant Timothy Buss in the pit of a landfill located approximately 2½ blocks south of the Allen Smith residence. The defendant lifted the dead body out of the pit and called Allen Coffman, another searcher in the area, to come help him carry her. Tara was nude except for her shirt, which was pulled up under her armpits. Her face was covered with blood, and a stick protruded from her anus.

Upon seeing the body Coffman felt sick, declined the defendant's suggestion to assist in moving the body, and told the defendant to stay there to keep other youngsters from seeing Tara's body while he went after the police.

Coffman found Lieutenant Greenstreet of the Bradley Police Department and led him to Tara's body. The scene was secured, and the defendant and Coffman were taken to the police station for their statements regarding the discovery of Tara's body.

The defendant, who was wearing a white T-shirt, blue jeans and sneakers, was joined by his father, David Buss, at the police station. Around 10 p.m., juvenile officer Catherine Bergen, pursuant to routine procedures, explained to defendant and his father the *Miranda* warnings and had defendant initial on a preprinted form as to his understanding of each segment and sign the form. The execution of the form was witnessed by Bergen and David Buss.

The defendant thereafter described his discovery of Tara's body and his own activities of the day leading up to that event. The defendant stated that he had not been in school on May 21, 1981, because his class had gone on a field trip and he had elected not to go because of the cost of the trip and the fact that he had planned to take a trip with his grandfather to Texas. In the morning he had gone across the street from his aunt's home where he was staying to the garage next to Allen Smith's house to help Jerry Beattie wash his car. When they finished washing and waxing it, the defendant went back home where his cousin fixed hamburgers for lunch. The defendant watched television for a while, and at 2:30 p.m., he went to see his friend Gary Clough at his home. At 3 p.m., the defendant returned home, and 10 minutes later his grandmother, Alice Buss, picked up the defendant and his brother and sister and drove them to her home in the trailer park. There, the defendant played softball.

Defendant further stated that at 6:30 p.m., Mrs. Buss drove him

back to his aunt's place. After depositing the baseball glove and bat in the house, the defendant went back across the street to the Allen Smith house. Smith told the defendant that Tara Huffman was missing. Homer Smith remarked that Tara liked to swim, so they got into a truck and drove down near to the creek. The defendant then proceeded on foot along the creek to a cavity in the ground. There he observed an arm sticking out from under some pieces of foam rubber. He pulled the foam rubber away and saw Tara's face with blood coming from her nose.

Defendant said that he felt the little girl's throat and noted that her arms were stiff and her eyes were partially opened. Then he yelled to Coffman (whom the defendant had not known at the time), "I found her." Coffman asked if she was all right. The defendant said she was dead and then lifted the girl's body out of the hole, set her down, and lifted her one more time to move her farther from the hole. Coffman came over and saw the body. The defendant asked Coffman if he could borrow his bike to get help. Coffman said no, he'd go himself. He left and then the defendant told a woman that he'd found the body and told her to keep the children away from the area. The defendant walked a distance and then spotted a policeman. He turned back and pointed to where the body lay, and the police took charge from there.

Officer Bergen was acquainted with Gary Clough and had been led to believe that he had gone to live in Florida with his father. After listening to the defendant's account of his activities during May 21, 1981, Bergen first assured herself that the defendant was referring to the same individual, and then asked the defendant what he did at Gary's house. The defendant said that they had sat around and talked.

Bergen also observed hairline scratches on the defendant's face and a reddish-brown stain on the thigh of his pants. While the defendant's statement was being typed up, Bergen telephoned Gary Clough's mother and asked if Gary was at home. Mrs. Clough said no, he was in Florida. Upon further interrogation, the defendant reconfirmed that he had been with Gary and had talked with him.

The officers told the defendant that they wanted him to remove his clothing and leave it for processing. The defendant did so and eventually was allowed to leave the police station with his father around 5 a.m. of May 22.

While the defendant was still at the police station, Judith Wilkens telephoned the police to report an incident that had occurred earlier in the day and which she thought might have some significance. Mrs.

Wilkens lived in the neighborhood between the Allen Smith residence and the landfill area where Tara's body was discovered. Mrs. Wilkens stated that around 2:30 p.m. of May 21, a boy had come to her door and asked to borrow her children's wooden wagon which was in the yard. The boy wore a white T-shirt, blue jeans, tennis shoes and a baseball cap. He was sweating heavily and had a fiber barrel which he explained was full of junk from cleaning the garage. He wanted to use the wagon to carry the barrel to the dump. Mrs. Wilkens observed that the boy avoided eye-contact with her and acted very nervous, and that he had thick lips. When he assured her he'd return the wagon, she gave him permission as requested and then returned to her kitchen. Later that day Mrs. Wilkens noted that the wagon had been returned to her front yard. That evening, Mrs. Wilkens told her husband, a former police officer, about the incident. At his suggestion she called the Bradley police.

A squad car was dispatched to the Wilkens home to pick up the wagon. Mrs. Wilkens was given a statement form to complete at home with the help of her husband. When she saw the defendant at the police station, Mrs. Wilkens asked, "Who is that boy?" She was told that he was the one who had found Tara's body. Although Mrs. Wilkens recognized the defendant as the person who had borrowed the wagon, she did not say so either at the station or in her statement. She remarked to her husband that she recognized the defendant on their way home from the station that night. Later, when called to view a lineup, Mrs. Wilkens identified the defendant as the person who had borrowed her wagon.

At trial several neighbors testified that they had observed either the defendant or an individual matching the description of the defendant at various times on May 21, at the Smith residence, across the street standing on the porch of his aunt's house with a small child, carrying a barrel southwards down an alley, pulling a wagon with a barrel towards the landfill and pulling an empty wagon back north away from the landfill area. Further testimony established that the defendant's grandmother was an employee of Mortell Company and that she had been given two barrels similar to one that was found at the landfill near where Tara's body was discovered. Witnesses who had seen the defendant with a barrel confirmed that the barrel found at the landfill resembled the one they had observed in defendant's possession. Forensic examination of the barrel disclosed traces of blood consistent with Tara's, and the defendant's palm print was on the lid. It was also established that the barrel was, in fact, one which had been used by Mortell's. The stain on defendant's pants proved to

be blood, also consistent with Tara's type.

One of the witnesses, whose testimony placed the defendant on the premises of the Allen Smith residence shortly before Tara's disappearance, stated that he had seen the defendant etching in the gravel with a stick of a size consistent with the branch found in the dead girl's body. A broken-off portion of the same branch was located in the pit area where Tara was found. An autopsy revealed that the stick had been thrust into Tara's body after she died. The autopsy also disclosed that the time of Tara's death was somewhere between 1:30 and 2:30 p.m. The cause of death was a single blow to the head accomplished with either a blunt instrument or by smashing the child's head against a hard surface. The skull was fractured by the blow. The police investigation failed to ascertain either the scene of the murder or the instrument used to fracture Tara's skull.

In addition to the evidence adduced at trial, the police had received several other reports by citizens seeking to assist in the investigation which did not prove relevant to the instant crime.

On appeal, defendant initially urges that his conviction must be reversed because the circumstantial evidence was insufficient to exclude every reasonable hypothesis of his innocence. Defendant points to certain inconsistencies in the details described by various witnesses in their written statements and at trial, uncertainty of the time of day when the defendant was observed by the witnesses, and the variety of physical descriptions and age estimations given to police by witnesses who did not know the defendant but had observed an individual with his general appearance on the day of the crime. We have read the entire record in this case, and we believe that defense counsel adequately exposed through cross-examination the several inconsistencies and thus tested the credibility of the State's witnesses. While it is beyond cavil that the State's burden is to prove beyond a reasonable doubt that the defendant and no one else committed the crime, we will not upset a jury verdict resulting in conviction on review unless we find the evidence so improbable or unsatisfactory as to create a doubt as to the defendant's guilt.

The circumstantial evidence linking the defendant to the crime is not insubstantial in this case. The defendant's positively identified palm print was on the cover of the barrel found in the landfill area. The barrel had blood stains consistent in blood type with Tara's, and the pattern of the staining was consistent with the blood on Tara's body. The State demonstrated that a child of approximately Tara's size and age would fit into the barrel. The defendant was identified as the person seen carrying a barrel similar in appearance to the barrel

later found in the landfill. He was observed having trouble with the weight of that barrel, and he used a wagon to transport it in the direction of the landfill. Later, the defendant elected to conduct a search by himself of the landfill area where the body would be found, and he sent a co-searcher, Terry Clark, off in an alternate direction. Upon locating Tara's body, the defendant succeeded in lifting it up off the ground, but he complained that it was heavy and he wanted help carrying it. The defendant's alibi to cover the period when Tara was killed was proved false. We conclude that the State met its burden of proof in this case. See *People v. Weaver* (1982), 92 Ill. 2d 545, 442 N.E.2d 255; *People v. Johnson* (1980), 82 Ill. App. 3d 338, 404 N.E.2d 796.

■ Reversible error will be found in a circumstantial case such as this where the trier of fact ignores exculpatory evidence regarding the defendant's presentation of a reasonable, probable defense. However, where no such defense can be found, the decision of defendant's guilt or innocence will not be upset. (*Cf., People v. Calhoun* (1972), 4 Ill. App. 3d 683, 281 N.E.2d 363; *People v. Sumner* (1982), 107 Ill. App. 3d 368, 437 N.E.2d 786.) Having searched the record before us, we do not find a reasonable hypothesis arising from the evidence which is consistent with the defendant's innocence. The jury, as trier of fact, was presented adequate evidence from which inferences could be drawn based on their assessment of the physical evidence and credibility of the State's witnesses. The jury's verdict of guilty is justified under the circumstances. Accordingly, we will not reverse the defendant's conviction on the basis of defendant's reasonable doubt arguments.

■ For the same reasons expressed above, we find no error in the trial court's denial of defendant's motion for a directed verdict of not guilty. On appeal, the defendant cites *People v. Van Cleve* (1982), 89 Ill. 2d 298, 432 N.E.2d 837, as precedent for the trial court's authority to enter an acquittal notwithstanding a jury verdict of guilty when the court chooses to reserve judgment on the defendant's motion for a directed verdict. Defendant also quotes certain comments made by the trial judge at the close of all evidence which, he argues, evince the court's dissatisfaction with the sufficiency of the State's evidence in this case. We have scrutinized the trial record in this regard and are convinced that the significance defendant attaches to the trial judge's comments, reviewed in context, is not justified. Nowhere did the trial judge state that the State's evidence was insufficient as a matter of law. Nor do his comments imply such. The issue of guilt was properly submitted to the jurors and properly determined, based

on their weighing of the evidence and their findings of fact. The trial court's denial of defendant's motion was not error under the circumstances.

The defendant's next contention is that he was denied a fair trial because his pre-arrest statement was improperly admitted as evidence against him. We do not agree.

■ While it is true that a false exculpatory statement is not conclusive evidence of the defendant's consciousness of guilt (*People v. Puente* (1981), 98 Ill. App. 3d 936, 424 N.E.2d 775), a pre-arrest exculpatory statement is admissible in the State's case-in-chief as probative evidence of the defendant's consciousness of guilt. (*Puente; People v. Wilson* (1972), 8 Ill. App. 3d 1075, 291 N.E.2d 270.) The defendant's pre-arrest statement in this case included an alibi covering the period of day when Tara was killed and her body was delivered to the landfill. According to his statement, the defendant was visiting his friend, Gary Clough. At trial it was uncontradicted that Gary Clough was in Florida at the time. Defendant counsel conceded that the defendant's story about being with Gary Clough was a lie, but argued that the defendant chose not to admit that in fact he was illegally shooting off firecrackers stolen from his cousin, Jim Hess, at the time in question.

■ Although there was evidence that the defendant was playing with firecrackers earlier in the afternoon, the evidence lends no support for defense counsel's theory that the activity continued during the period when defendant chose to place himself in the company of Clough. Under the circumstances, it was the jury's function to consider both the State's and the defendant's theories to explain why defendant lied about his activities between 2:30 and 3 p.m. on the day of the crime. We find no error in the trial court's denial of defendant's motion *in limine* to exclude his pre-arrest statement to the police.

Defendant's fourth and fifth assignments of error spring from allegedly unfair discovery procedures employed by the State's Attorney's office. Defense counsel vehemently maintained throughout the course of defendant's trial that the State's Attorney was not complying with the court's pretrial discovery order. The State's Attorney was equally insistent that all discoverable materials were turned over to defense counsel as they became available to the State.

In fact, interview notes taken of 41 potential witnesses were not turned over to defense counsel until after the trial was in progress. When the existence of these notes was disclosed, the trial court ordered the State's Attorney to submit them to him for an *in camera*

examination to determine whether they constituted privileged work product material or substantially verbatim reports of oral statements discoverable under authority of *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194. The trial court determined that 12 of the 41 notes contained some discoverable material. These were tendered to defense counsel accordingly. The remaining 29 witness interview notes were likewise submitted to defense counsel for examination following defendant's conviction for purposes of perfecting his arguments on appeal.

■ We have reviewed the 41 notes in question and conclude that no violation of the defendant's constitutional right to due process can be found. Initially, we agree with the trial court that none of the undisclosed interview notes contain substantially verbatim statements of the interviewees favorable to the defendant. The only verbatim statement that defendant points to on appeal is a single sentence circled in the notes taken of Ronald Cluny's interview. Cluny was Tara's brother-in-law. The notes indicate that he said, "Tara didn't say anything to Allan Smith about going to Rose's house." Even if this isolated sentence were considered a violation of the discovery statute (73 Ill. 2d R. 412(a)(i)), the information contained therein has not been shown to be favorable to the defendant in a constitutional sense. (*Brady.*) To be "favorable," the statement would have to be shown to be exculpatory or to have value as impeachment or mitigation evidence. (*In re Hatfield* (1979), 72 Ill. App. 3d 249, 390 N.E.2d 453.) Certainly this statement cannot be said to exculpate the defendant. Nor has the defendant shown how it could have had value for impeachment or mitigation purposes. Defendant has failed to demonstrate that the statement in question might have formed the basis for any favorable defense argument. (*Hatfield.*) Accordingly, we conclude that the State's failure to disclose a statement or summary of the State's Attorney's interview with Ronald Cluny constituted, at most, a statutory violation which was harmless in this case.

We have reviewed as well the remaining notes which defendant claims should have been disclosed to him under the court's discovery order. All of them are, as the trial court correctly determined, simply the State's Attorney's work product. We find neither substantially verbatim statements in them nor any material which could be said to be "favorable" in the constitutional sense. The defendant has not demonstrated on appeal that the material contained in those notes might have formed the basis for a favorable defense argument. Accordingly, we find no error in the trial court's ruling respecting those notes.

Finally, we find no merit in defendant's arguments concerning alleged prosecutorial and judicial misconduct. Defendant contends that one of the assistant State's Attorneys lied about taking notes during the interview with Ronald Cluny. Defendant's charge is unsubstantiated by the record, and we hold that the trial court properly denied defendant's motion for mistrial based on this charge.

■ Defendant next charges misconduct in connection with the trial court's *in camera* inspection of the 41 witness interview notes, conducted in chambers out of the defendant's presence. Defendant cites absolutely no authority for his position that the court's inspection of documents under Supreme Court Rule 412(a)(i) is "a critical stage of the trial" to which defendant has an "absolute right to be present." Authority to the contrary is found in *People v. Jenkins* (1975), 30 Ill. App. 3d 1034, 333 N.E.2d 497, wherein the court considered this precise issue. The court there stated that "a requirement [that the Rule 412(a)(i) inspection take place in the presence of counsel] would completely defeat the purpose of *in camera* examinations." (30 Ill. App. 3d 1034, 1042, 333 N.E.2d 497, 504.) Defendant's argument that the State's Attorney was impermissibly allowed to explain *ex parte* what the material handed over to the judge consisted of adds nothing to defendant's charges of judicial and/or prosecutorial misconduct. It is clear to us that the court's inspection of the documents properly took place to the exclusion of counsel for both sides. Any conversation between the judge and the State's Attorney concerning the notes took place in anticipation of the court's inspection, not during it. Having found no indication of either judicial or prosecutorial misconduct, we affirm the trial court's denial of defendant's motion for mistrial on this basis as well.

In summary we find no grounds either for reversing defendant's conviction or for granting him a new trial.

Affirmed.

ALLOY and SCOTT, JJ., concur.