THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MICHAEL HARRIS, Defendant-Appellant.

First District (4th Division)   No. 81—3064

Opinion filed May 10, 1984.

James J. Doherty, Public Defender, of Chicago (Hugh Stevens, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Paula Carstensen, and Edward Barron, Assistant State's Attorneys, of counsel), for the People.

JUSTICE ROMITI delivered the opinion of the court:

Following a jury trial defendant Michael Harris was found guilty of the murder of Valencia Harris, the attempted murder and aggravated battery of Jerome Jones, and the aggravated battery of Robert Freeman. He was sentenced to 40 years' imprisonment for murder,

five years consecutive for aggravated battery of Freeman, 12 years consecutive for attempted murder, and five years concurrent to the 12 years for aggravated battery of Jerome Jones, for a total of 57 years. On appeal defendant contends: (1) the trial court erred in refusing to instruct the jury on voluntary manslaughter based on provocation and involuntary manslaughter; (2) the court abused its discretion in sentencing defendant to consecutive terms of imprisonment.

We affirm.

The testimony of the State's witnesses established the following chain of events. Jerome Jones, the brother of Valencia Harris, testified that on May 5, 1978, Valencia lived with their father in Chicago. At 9 p.m. that day Jerome and his girlfriend arrived at Valencia's home. Valencia had told Jerome that day that she was going to divorce the defendant. When the defendant subsequently rang the doorbell Jerome told Valencia to call the police. He went to the front door and asked the defendant what he wanted. Defendant asked to talk to Valencia but Jerome told him she did not want to talk to him. When defendant asked who was in the house Jerome told him it was none of his business. The defendant broke a glass pane in the door and reached in to open the door. He then ran around the side of the house to the kitchen door. There he kicked in an outer storm door and broke the glass on the inner door in order to reach in to open the door. Jerome took a butcher knife from the kitchen and threatened to cut off the defendant's arm if he did not remove it. The defendant said he was going to kill Jerome and then retreated. Before running off defendant threw bricks and items ripped from Valencia's car at the home's windows.

Jerome telephoned his grandparents, Robert and Julia Freeman. He told Robert what had happened and asked him to bring a gun. The police subsequently arrived and toured the area in a fruitless search for the defendant. The Freemans arrived at the house and shortly thereafter Valencia yelled that defendant was outside, armed with a gun. Jerome asked Julia Freeman if she had brought a gun but she did not respond. Robert Freeman stated that he would talk to the defendant.

Robert testified that when he unlocked the front door the defendant shoved it open, knocking him against the wall. Robert reached for the defendant and defendant struck him on the head with the gun, knocking him to the ground. Robert followed defendant up some stairs, stating that he wanted to talk to him. But when defendant pointed the gun at him Robert backed into the living room, out of sight of the defendant. He then heard a shot.

Jerome testified that after Robert went toward the front door he went to the middle bedroom where Valencia was. He saw defendant enter a first bedroom down the hall. Defendant fired a gun at Jerome. Jerome ran to the kitchen, heard another shot, and ran back to the middle bedroom. He again ran to the kitchen, asking Julia where the gun was. She told him it was in her bag, and he retrieved it and returned to the middle bedroom. According to Julia during this time the defendant had also fired a shot at her.

When Jerome returned to the middle bedroom with the gun he saw Valencia using the phone on the east side of a bed. Defendant, on the west side of the bed, raised his arm and shot Valencia in the face. She fell to the floor and tried to get under the bed. As she did so defendant leaned over the bed and shot her twice more. Julia Freeman also testified that she saw the defendant walk into the middle bedroom with a gun, shoot Valencia once, and then shoot her twice more after she fell.

Jerome attempted to shoot the defendant but his gun would not fire. Defendant pointed his gun at him, saying he was going to kill him. Jerome dropped his gun and ran. The defendant fired his gun, but the bullet did not strike Jerome.

Jerome escaped the house by diving out a back window into the yard. As he fled over a fence his clothing became entangled. The defendant caught him and straddled him on the ground. Defendant announced that he was going to kill him, pointed his gun at Jerome's chest, and the gun "clicked" two or three times. He then hit Jerome over the head with the gun, causing a large gash. When defendant dropped the gun Jerome grabbed him yelling for help. Defendant struck him on the head with a garbage can lid and ran off. He ultimately fled the State and was arrested in Maryland. Valencia was pronounced dead at the hospital at 10:40 p.m. It was stipulated that if called the pathologist who examined her body would testify that death was caused by multiple gunshot wounds. She had been struck by three bullets. One pierced the left area of her nose and continued down through her lung; a second bullet pierced her left thigh, and the third bullet pierced her left arm and lodged in her chest.

Defendant testified that he had married Valencia Harris in April 1975. In April of 1978 they separated, defendant moving in with his mother and Valencia moving in with her father. Defendant spoke to her about reconciling. During this period she informed him she had a boyfriend, Reginald Banks, and at one point introduced Banks to him. Defendant testified that he was jealous of Banks. Late in April defendant gave his wife money for the downpayment on an apartment

she was to find for them. Instead she used the money to buy a car. Defendant testified that at this time he believed she was seeing other men. He lost his job because he was absent so often in attempts to talk to her.

The afternoon of May 5, 1978, defendant planned to visit his wife. He called her father's house several times but there was no answer. At 6:30 p.m. he began drinking rum. At 7 p.m. he looked for Valencia at her house, her girlfriend's house and Banks' house. At the latter home he was told that Banks was out. He concluded that Banks and his wife were out together. Defendant returned to Valencia's house some time after 8:30 p.m., having finished a pint bottle of rum. He rang the bell and Valencia answered the door. When he told her he wished to talk to her she told him to get away from the door. Defendant spotted Jerome Jones in the house and asked who he was. Jerome responded that he was Valencia's boyfriend and told him to get away from the door. Defendant believed Banks was in the house, and he kept asking Jerome who was in there. Defendant testified that he was upset and angry because he wanted to see his wife and because he wanted to know if Banks was in the house. Defendant admitted that he then made the attempts to get into the house as described by Jerome in his testimony.

Defendant next drove to his brother's home and obtained a gun from a closet, checking to be sure it was loaded. He returned to Valencia's home, still upset in his belief that she was there with Banks. Defendant admitted striking Robert Freeman with the gun when he entered the home. He testified that when he entered the first bedroom he saw Jerome pointing a gun at him from a hall leading to the middle bedroom. Defendant jumped to the side and shot at Jerome. He then entered the middle bedroom where he saw Valencia standing by the bed, speaking on the telephone. As defendant approached her to talk to her he saw Jerome standing behind her in a doorway leading to the kitchen. Jerome had a gun pointed at defendant and defendant heard the gun clicking. Defendant ducked, turning away from Jerome, and shot at him from a distance of about eight feet. Valencia was hit and defendant ran, chasing Jones out the back, attempting to shoot him when he caught him, and striking him over the head with the gun. Defendant then fled.

Defendant's mother testified that in April of 1978 defendant appeared upset and depressed. He began to drink more and was often drunk, a condition she had never before witnessed in him. The evening of the shooting he seemed unusually quiet and appeared depressed.

## I

It is defendant's contention that based on these facts the trial court erred in refusing to instruct the jury on voluntary manslaughter based on provocation and involuntary manslaughter. Over State objection the jury was instructed on voluntary manslaughter based on a mistaken belief that self-defense was justified.

Voluntary manslaughter is statutorily defined as follows:

"A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) The individual killed, or

(2) Another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

Serious provocation is conduct sufficient to excite an intense passion in a reasonable person." (Ill. Rev. Stat. 1981, ch. 38, par. 9—2(a).)

Defendant first contends the jury could have concluded that he shot his wife in a fit of passion provoked by what appeared to be an adulterous meeting between his wife and Reginald Banks. The committee comments to the Illinois statute cite adultery as one of the categories of provocation recognized within the law while also indicating that the reported cases in Illinois have only involved actual or threatened physical harm as opposed to such categories as adultery or illegal arrest. (Ill. Ann. Stat., ch. 38, par. 9—2, Committee Comments, at 393-94 (Smith-Hurd 1979).) Defendant has not cited to any Illinois case in which the discovery of adultery has been held to constitute sufficient provocation in itself, nor has our research disclosed such a case. (See *People v. Jenkins* (1975), 30 Ill. App. 3d 1034, 333 N.E.2d 497; *People v. Wax* (1966), 75 Ill. App. 2d 163, 220 N.E.2d 600, *cert. denied* (1967), 387 U.S. 930, 18 L. Ed. 2d 991, 87 S. Ct. 2051.) But of even greater significance is the fact that, as Illinois courts have recognized in several cases, this form of provocation has generally been limited to instances where the parties are discovered in the act of adultery or immediately before or after such an act, and the killing immediately follows such discovery. (*People v. Wax* (1966), 75 Ill. App. 2d 163, 220 N.E.2d 600, *cert. denied* (1967), 387 U.S. 930, 18 L. Ed. 2d 991, 87 S. Ct. 2051; *People v. Jenkins* (1975), 30 Ill. App. 3d 1034, 333 N.E.2d 497; *Palmore v. State* (1969), 283 Ala. 501, 218 So. 2d 830; *State v. Ward* (1974), 286 N.C. 304, 210 S.E.2d 407, *death penalty vacated* (1976), 428 U.S. 903, 49 L. Ed. 2d 1207, 96 S. Ct. 3206; 40 Am. Jur.

2d *Homicide* sec. 65 (1968).) Even under what has been viewed as the more liberal approach, where discovery by verbal communication has been held to be sufficient, it would appear that the information communicated must be that adultery actually took place and the resulting homicide must closely follow the communication of this information. *Commonwealth v. Schnopps* (1981), 383 Mass. 178, 417 N.E.2d 1213; *Haley v. State* (1920), 123 Miss. 87, 85 So. 129; W. LaFave & A. Scott, Criminal Law 575-77 (1972); 40 Am. Jur. 2d *Homicide* sec. 66 (1968); see *Tripp v. State* (1977), 36 Md. App. 459, 374 A.2d 384.

Examination of two Illinois cases which have affirmed voluntary manslaughter convictions based on facts which included a wife's confession of adultery immediately prior to the killing (*People v. Ahlberg* (1973), 13 Ill. App. 3d 1038, 301 N.E.2d 608; *People v. Carr* (1980), 91 Ill. App. 3d 512, 414 N.E.2d 1108, *cert. denied* (1981), 454 U.S. 848, 70 L. Ed. 2d 136, 102 S. Ct. 167), establishes that the revelation of adultery was but one of a series of statements or circumstances found by the courts to be so provoking as to constitute an exception to the general rule in Illinois that words alone cannot constitute sufficient provocation to reduce a murder to voluntary manslaughter. Thus in *Ahlberg* the defendant's wife moved out of the house with the children, told defendant he had never satisfied her sexually, also told him she had found an older man who could love her and the children more than he could, and then announced her intention to divorce him. The court held that under these circumstances to follow the general rule concerning mere words as insufficient provocation would create a miscarriage of justice. In *Carr* the defendant's wife returned from a two-week separation and got into an argument with him over her attempt to retrieve certain items of property, culminating in her telling him she had found a real man. The reviewing court relied on *Ahlberg* in affirming the conviction. In our view these cases do not support the proposition that Illinois has adopted the more liberal approach concerning verbal communication of the fact of adultery as provocation. Nor do we find insignificant the fact that in both cases a finding that the evidence did not support the voluntary manslaughter instructions which the defendants had objected to could have resulted in absolute reversal of the defendants' convictions.

Defendant has cited the case of *People v. Curwick* (1975), 33 Ill. App. 3d 757, 338 N.E.2d 468, in which a conviction for voluntary manslaughter was affirmed under circumstances indicating that the defendant killed the woman he had lived with after learning from her and her boyfriend that they had been involved for some time and planned to marry in a few days. But the reviewing court in *Curwick*

held only that the defendant, having requested an instruction on voluntary manslaughter, could not on appeal contend that it should not have been given. The court did not address whether the instruction was justified under the facts of the case.

It is apparent in any event that the facts of this case do not fall with any recognized form of discovery-of-adultery provocation for voluntary manslaughter. The defendant never testified that he believed his wife was committing, had committed, or was about to commit adultery. He testified only that he believed she was in the house with her boyfriend, Reginald Banks. Moreover, by his own admission defendant had known since the month before that his wife was dating Banks, and indeed he had even been introduced to Banks by his wife. Under these circumstances we find no error in the trial court's determination that defendant was not entitled to a voluntary manslaughter instruction based on this form of provocation. *People v. Jenkins* (1975), 30 Ill. App. 3d 1034, 333 N.E.2d 497.

Defendant next contends that the jury could have found that he was acting under serious provocation from Jerome Jones when in an attempt to shoot Jerome he accidentally or negligently shot Valencia. This theory requires a finding that defendant was entitled to claim serious provocation by Jerome. The sole case cited by defendant in support of this is one in which there was some evidence of mutual combat followed by the victim first drawing a gun on the defendant. (*People v. March* (1981), 95 Ill. App. 3d 46, 419 N.E.2d 1212.) In this cause by the defendant's own admission he attempted to break into the house through several doors and then left to obtain a gun, returning to storm the house, pistol-whipping Jerome's grandfather in order to gain entry. The law does not permit one who instigates an assault on another to then rely on the victim's response to that assault as evidence of mutual combat sufficient to mitigate a subsequent killing from murder to manslaughter. (*People v. Matthews* (1974), 21 Ill. App. 3d 249, 314 N.E.2d 15; *People v. Causey* (1978), 66 Ill. App. 3d 12, 383 N.E.2d 234; see *People v. Handley* (1972), 51 Ill. 2d 229, 282 N.E.2d 131; *cert. denied* (1972), 409 U.S. 914, 34 L. Ed. 2d 175, 93 S. Ct. 247.) Therefore defendant was not entitled to have the jury instructed on voluntary manslaughter based on the alleged provocation by Jerome Jones.

Defendant also contends that the jury should have been instructed on involuntary manslaughter, defined by statute (Ill. Rev. Stat. 1981, ch. 38, par. 9—3) as occurring when:

> "A person * * * unintentionally kills an individual without lawful justification * * * if his acts whether lawful or unlawful which

cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly ***."

Recklessness is defined as follows:

"A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." (Ill. Rev. Stat. 1981, ch. 38, par. 4—6.)

Involuntary manslaughter does not involve behavior in which there is an intent to inflict injury. (*People v. Bolden* (1968), 103 Ill. App. 2d 377, 243 N.E.2d 687.) Yet defendant's citation of *People v. Davis* (1974), 18 Ill. App. 3d 173, 309 N.E.2d 338, suggests that his theory is that although he fired his gun with the intention of killing Jerome Jones, his acts were only reckless as to Valencia. In *Davis* defendant's theory was that he intentionally fired at one man but was not aware of a second victim who was standing further inside an apartment. The reviewing court concluded that on these facts an instruction on involuntary manslaughter should have been given. The *Davis* court made no reference to the doctrine of transferred intent, a doctrine which we find to be controlling here. When a defendant shoots at one person, intending to kill him with no legal justification, but accidentally kills another person whom he did not intend to kill, he is still guilty of murdering that unintended victim. (*People v. Marshall* (1947), 398 Ill. 256, 75 N.E.2d 310; *People v. Johnson* (1978), 66 Ill. App. 3d 84, 383 N.E.2d 648.) Here where under defendant's own theory of the case he was intending to shoot one person but accidentally shot a second person, he was not entitled to have the jury instructed on involuntary manslaughter for the killing of that allegedly unintended victim.

## II

■ Defendant's final contention is that the trial court abused its discretion in imposing on him consecutive sentences totalling 57 years. Section 5—8—4(b) of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—4(b)) provides:

"The court shall not impose a consecutive sentence unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which

the court shall set forth in the record."

In sentencing the defendant the trial court noted that defendant had been convicted of burglary in Maryland and was sentenced to 10 years in the penitentiary for that offense, which occurred after the commission of the offenses at issue here. The court was also informed of two prior felony convictions for theft, a conviction for aggravated battery, and a conviction for escape. At the hearing the defendant informed the court that he had perjured himself in his trial testimony, that he had planned his actions and had intended to use the insanity defense. The court expressly indicated that it took all these factors into consideration. The court then reviewed the facts of this case and stated that it had concluded that defendant was a "dangerous, dangerous person" and would remain so.

These comments by the sentencing court clearly establish that the court was of the opinion that consecutive terms were necessary for the protection of the public. Because this constitutes sufficient compliance with the statutory requirements and because we find no abuse of discretion in this determination we will not disturb the sentences imposed. *People v. Hicks* (1984), 101 Ill. 2d 366; *People v. Pittman* (1982), 93 Ill. 2d 169, 442 N.E.2d 836.

The judgment of the trial court is affirmed.

Affirmed.

LINN, P.J., and JIGANTI, J., concur.