THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WILLIAM L. FRANKLIN, Defendant-Appellant.

First District (4th Division)   No. 83—160

Opinion filed February 14, 1985.—Rehearing denied April 2, 1985.

Steven Clark, of State Appellate Defender's Office, of Chicago (Douglass G. Hewitt, of Winston & Strawn, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Kevin Sweeney, and Elizabeth Loredo Rivera, Assistant State's Attorneys, of counsel), for the People.

JUSTICE JOHNSON delivered the opinion of the court:

Defendant, William Franklin, appeals his conviction for murder (Ill. Rev. Stat. 1973, ch. 38, par. 9—1(a)) after a bench trial in which he was sentenced to a term of 100 to 300 years. He raises two issues for review: (1) whether the trial court erred in denying the motion to quash his arrest and to suppress its fruits, and (2) whether the exclusion of defense counsel from an *in camera* hearing on his motion to strike the State's answer to discovery violated his constitutional rights to due process of law, confrontation of adverse witnesses, and effective assistance of counsel.

We affirm.

Defendant was charged with the murder of James Rowland in a park in Markham on May 14, 1976.

Defendant moved to strike the State's answer to discovery because it did not provide the address of Calvin Williams, its principal witness against defendant. The State gave Williams' address as "c/o State's Attorney of Cook County" because revealing his residence would risk grave and substantial harm to Williams.

On July 7, 1982, the trial court conducted an *in camera* proceeding. The transcript was sealed but it has been made a part of the record on appeal. At the proceeding, Williams, Assistant State's Attorneys Scott Arthur and Terence Burns and a court reporter were present. Defendant's attorney was not present. Williams was questioned by Arthur. Williams testified that defendant was his uncle, his mother's brother. Defendant had made an admission to Williams in connection with the Rowland homicide and also in connection with another offense.

In January 1982, Williams revealed these admissions to the State's Attorney and was placed in protective custody. Previously, Williams lived with his mother in Markham, where they had been re-

siding since 1973 or 1974. Before that, the family resided in Gary, Indiana.

Williams testified at defendant's preliminary hearing. Also present were two of Williams' uncles, defendant's brothers. Both brothers had histories of violent acts. One brother told a friend of Williams' that Williams had better change his statement about defendant "or else." The other brother, who lives in the Chicago area, told Williams' mother that he wished Williams was not involved in the case because he would hate to see Williams hurt.

Williams also testified that defendant associated with drug dealers and extortionists. The trial court ruled that the State's Attorney did not have to reveal Williams' address.

At a suppression hearing on July 27, 1982, defendant testified that on May 25, 1976, at 10:30 p.m., he was driving south in the vicinity of 82nd and Halsted streets, in Chicago. The police signaled him to stop. Two police officers exited their squad car, and one officer approached defendant and asked for his driver's license and vehicle registration. Defendant did not have the latter. The officer told defendant to get out of the car, which he did. The officer conducted a pat-down search and removed bullets from defendant's pocket. The officer asked defendant whether he had a firearms registration. Defendant did not. The officer handcuffed and formally arrested defendant and then searched the car for 30 to 45 minutes. The officers had no warrant to arrest defendant. Defendant did not own the car which he was driving.

Thomas Kelly, a Chicago police officer, testified that on May 25, 1976, at 10:30 p.m., he was on routine patrol in a marked car in the vicinity of 82nd Street and Halsted. He noticed a 1974 Oldsmobile traveling south with the headlights off. Kelly made a U-turn to curb the vehicle and parked the police car four to five feet behind the Oldsmobile. As Kelly approached the car, defendant exited his car. Kelly informed defendant of the violation and asked defendant for his driver's license and proof of ownership of the automobile. Defendant said he had his license and that the car was his. Defendant withdrew his license from his pocket. As he handed the license to Kelly, the latter noticed that defendant's hand was shaking visibly. Kelly asked defendant for registration papers; he did not have them.

After defendant handed Kelly his license, he (defendant) took one or two steps toward the curb, away from Kelly. His eyes moved from left to right at a rapid rate and his hand shook. His hand went toward his right pocket, but did not enter the pocket, and then back to his side. Then defendant took another step toward the curb. Finally, he

stepped onto the curb and his hand went toward his right pocket again. At that point, Kelly made a pat-down search of defendant for safety reasons.

Kelly found .45-caliber bullets in defendant's pocket. He asked defendant whether he had a firearms identification; he did not. Kelly arrested defendant, advised him of his rights, and handcuffed him. Kelly opened the door to the Oldsmobile and observed a revolver below the driver's seat. Kelly noticed that the vehicle identification numbers on the dashboard and passenger door were different. A check of the numbers revealed that the vehicle had been stolen. On cross-examination, Kelly admitted that defendant did not threaten him in any way.

At the close of the hearing, the trial judge ruled that the police officer's pat-down search of defendant was proper and denied defendant's motion to quash the arrest and suppress evidence.

At trial, the principal witness against defendant was his nephew, Calvin Williams, 22 years old. Williams testified that on May 14, 1976, he was 15 years old and living in Markham. At 10:30 or 11 p.m., he was in a park with two friends. As they were walking, they heard gunshots. They ran toward a footbridge where they saw a man standing; the man then ran from the scene. Williams recognized the man as defendant. Williams saw the victim lying on the ground and he saw what appeared to be blood. Williams went to his home, a block away. A few hours later, defendant came to Williams' home. Defendant had been living with the Williams family. Defendant said he had to leave for a few days and that he had shot a man near the footbridge. It was not until January 1982 that Williams informed the police of defendant's statements.

The victim died of multiple gunshot wounds. Expert testimony established that cartridges found in the vicinity of the victim were fired from the revolver seized from defendant.

At the close of trial, the judge found that the victim was killed by bullets fired from the weapon seized from defendant, that defendant shot the victim, and that Williams was a credible witness. He found defendant guilty of murder and sentenced him to a term of 100 to 300 years. Defendant appeals.

Defendant argues at length that the trial court erred in denying his motion to quash arrest and to suppress evidence. He claims that the stop-and-frisk which occurred on May 25, 1976, and which resulted in seizure of the weapon linking him to the Rowland homicide was unreasonable and violated his fourth amendment rights. The police officer was not justified in making a search for weapons because

of the offense—a minor traffic violation, driving with headlights off—or because of defendant's failure to produce the vehicle's registration, or because of defendant's "nervous" behavior. Defendant's conduct—his trembling hands, his eyes moving from side to side, the stepping away from the police officer and toward the curb—was subject to a variety of interpretations and inferences. However, the police officer could not reasonably infer that he was in potential danger. Nervousness is a natural response to a stressful situation such as a confrontation with police. Defendant cites *People v. Reed* (1967), 37 Ill. 2d 91, 227 N.E.2d 69, *People v. Mills* (1983), 115 Ill. App. 3d 809, 450 N.E.2d 935, and *People v. Dotson* (1976), 37 Ill. App. 3d 176, 345 N.E.2d 721, for the proposition that furtive looks, gestures, and movements do not justify the inference that the individual may be armed and is dangerous.

Defendant further argues that his conduct should have dispelled any fear the officer may have had for his safety. Defendant engaged in idle gossip with the officer; defendant was cooperative, responsive, used no profane or abusive language, and complied with the officer's requests in a prompt and diligent manner. Defendant claims that the police officer used the stop-and-frisk procedure as a subterfuge to conduct a general search to detect criminal activity, a subterfuge which is manifestly unconstitutional.

■■ ■ To justify a stop-and-frisk, a police officer must have knowledge of sufficient facts at the time of the encounter to create a reasonable suspicion that the person in question has committed, or is about to commit, a crime. (*People v. Smithers* (1980), 83 Ill. 2d 430, 434, 415 N.E.2d 327, 330, citing, among others, *Terry v. Ohio* (1968), 392 U.S. 1, 21, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880.) The fact that an officer has reason to stop a citizen does not necessarily justify the further intrusion of a search for weapons. The officer may conduct a pat-down search only if he has reason to believe that he is dealing with an armed and dangerous individual. Here again the officer's belief is not judged by the probable cause test. He need only have the reasonable belief that either his safety, or that of others, is in danger. *People v. Smithers* (1980), 83 Ill. 2d 430, 434-35.

■■ In the instant case, the officer was justified in stopping defendant for the traffic violation. The trial court properly concluded that the officer reasonably believed he was in danger because of defendant's conduct—his eyes shifting from side to side, his moving away from the officer, and his trembling hand moving toward his pocket. The cases cited by defendant are inapposite. In *People v. Reed* (1967), 37 Ill. 2d 91, 227 N.E.2d 69, and *People v. Mills* (1983), 115

Ill. App. 3d 809, 450 N.E.2d 935, the court ruled that defendant's nervous behavior did not justify a search of an automobile. In the instant case, defendant's behavior justified a pat-down search. After the officer discovered the bullets and defendant informed him that he did not have a firearms registration, the officer was justified in arresting defendant and searching the car. The instant case is distinguishable from *People v. Dotson* (1976), 37 Ill. App. 3d 176, 345 N.E.2d 721. In *Dotson*, defendant's nervous behavior consisted of sticking his hands in his pocket and shifting his weight, behavior which, in the court's opinion, suggested the individual was trying to keep warm on a cold day. (37 Ill. App. 3d 176, 177.) We hold that the trial court properly denied defendant's motion to quash arrest and to suppress evidence.

■ Defendant also argues at length that the trial court erred in excluding his attorney from the *in camera* hearing on his motion to strike the State's answer to discovery. Defendant contends that this exclusion violated his constitutional rights to due process of law, to confront adverse witnesses, and to effective assistance of counsel. Defendant acknowledges that where the personal safety of a witness may be jeopardized by disclosure, a defendant is not entitled to the address of a witness. The State, however, has the burden of proving actual and substantial risk of physical harm and that this risk outweighs the usefulness of disclosure to defendant.

The testimony of Calvin Williams was essential to defendant's conviction. Thus, his credibility was of serious importance. Defendant should have had the opportunity of testing Williams' credibility. Defendant cites *People v. Dace* (1983), 114 Ill. App. 3d 908, 449 N.E.2d 1031, as illustrative of the procedural safeguards which due process required in the instant case. In *Dace*, the appellate court instructed the trial court to hold an *in camera* hearing in the presence of prosecutors and defense counsel to determine whether certain privileged information was relevant or material to the impeachment of a witness. 114 Ill. App. 3d 908, 915.

In his reply brief, defendant contends that because he was excluded from the *in camera* hearing and was unaware of grossly prejudicial, inflammatory and patently improper material, his ability to make informed and intelligent decisions relating to the exercise or relinquishment of myriad constitutional and procedural rights was effectively and completely destroyed. His lack of knowledge impacted on other critical decisions which might have ameliorated the taint of error. Thus, his right to effective assistance of counsel was rendered meaningless and compromised his right to a fair trial.

Supreme Court Rule 412 provides that the State shall provide to

defense counsel "the names and last known addresses of persons whom the State intends to call as witnesses." (87 Ill. 2d R. 412(a)(i).) The court may deny disclosure if it finds that there is substantial risk to any person of physical harm or intimidation resulting from such disclosure which outweighs any usefulness of the disclosure to counsel. (87 Ill. 2d R. 412(i).) Upon request of any person, the court may permit a showing of cause for denial or regulation of disclosures to be made *in camera*. 87 Ill. 2d R. 415(f).

■ In our opinion, defendant was not prejudiced by the exclusion of counsel from the *in camera* hearing. Defendant does not argue that the trial court erred in refusing to disclose Williams' current address; rather, he argues that the trial court erred in excluding defense counsel from the hearing. While the better practice would have been to have defense counsel present (*cf. People v. Malone* (1983), 114 Ill. App. 3d 55, 448 N.E.2d 562 (better practice for trial court to refrain from comment)), defendant suffered no prejudice. The trial court heard extensive arguments by defendant for disclosure of Williams' address at proceedings on February 23 and 25, April 6, and June 30, 1982, and defendant submitted a memorandum of law in support of his position. Thus, before the *in camera* proceeding, the trial court was well informed on defendant's position. Defense counsel was aware of the previous addresses where the witness had lived prior to his disclosure to authorities of admissions made by defendant. Williams' move to a new address was necessitated by his desire for protection from defendant. Defense counsel was given an opportunity to interview Williams before trial and vigorously cross-examined him at trial.

■ We have not found a case confronting the precise issue raised here, but there are cases which suggest that an *in camera* proceeding pursuant to Supreme Court Rule 412(a)(i) is not a critical stage of a trial to which a defendant has an absolute right to be present. (See *People v. Buss* (1983), 112 Ill. App. 3d 311, 445 N.E.2d 894; *People v. Jenkins* (1975), 30 Ill. App. 3d 1034, 333 N.E.2d 497.) The case cited by defendant in support of his argument, *People v. Dace* (1983), 114 Ill. App. 3d 908, 449 N.E.2d 1031, is distinguishable from the instant case. In *Dace*, the appellate court instructed the trial court to determine in the presence of opposing counsel whether certain information was relevant or material to the impeachment of a witness. (114 Ill. App. 3d 908, 915.) In the instant case, the trial court merely had to determine whether the witness' address should be revealed, information which would not of itself affect the credibility of the witness. We conclude that the exclusion of defense counsel from the *in camera*

hearing did not violate defendant's constitutional rights.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JIGANTI, P.J., and LINN, J., concur.